# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE REINZ WISCONSIN<br>GASKET, LLC, a cancelled Delaware<br>limited liability company</td><td>)<br>)<br>)</td><td>C.A. No. 2022-0859-MTZ</td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: December 19, 2022
Date Decided: March 20, 2023

K. Tyler O'Connell, R. Eric Hacker, Samuel E. Bashman, MORRIS JAMES LLP, Wilmington, Delaware; Charles W. Branham, III, Todd Barnes, DEAN OMAR BRANHAM SHIRLEY, LLP, Dallas, Texas, *Attorneys for Petitioner.*

Kelly E. Farnan, Blake Rohrbacher, Jordan L. Cramer, Mari Boyle, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Respondent.*

**ZURN, Vice Chancellor.**

Workers exposed to asbestos suffering the delayed consequences of their exposure and their next of kin have sought damages from employers, suppliers, and manufacturers through tort litigation brought decades after the workers' exposure. Over the decades, some of those defendants' corporate forms have changed, and their assets have dwindled and changed hands. The petitioner here is a plaintiff in a federal action in which she and her husband sued many companies for damages flowing from her husband's exposure to asbestos, including the respondent gasket manufacturer, a Delaware limited liability company. While that case was pending, the petitioner's husband died, and the respondent dissolved and filed its certificate of cancellation.

The petitioner turned to this Court, seeking to nullify the company's certificate of cancellation and appoint a receiver on the grounds that the company's dissolution and cancellation were not compliant with the Delaware Limited Liability Company Act. The petitioner alleges the company failed to comply with the dissolution statutes because it still had assets when it dissolved that it should have set aside to compensate plaintiffs in pending asbestos lawsuits. The cancelled entity appeared as respondent, asserting it did not have any assets when it dissolved and so its dissolution and cancellation were proper. The respondent also argues the petitioner does not have standing to seek appointment of a receiver.

1

I conclude the petitioner has standing under 6 *Del. C.* § 18-805 to demonstrate good cause that the Court should appoint a receiver. I also conclude that she has demonstrated good cause by showing it is reasonably likely that the company had assets when it dissolved, which it failed to set aside for the pending claims against it, and thus dissolved in violation of 6 *Del. C.* § 18-804(b). I decline to outright appoint or rule out the petitioner's chosen receiver. Instead, I request the parties submit three possible receivers, and I will select one.

The receiver is tasked with drafting a report determining whether the company had assets when it dissolved. I will defer any ruling over whether the Court should nullify the company's certificate of cancellation until the receiver submits that report. I have determined, in my discretion, that the receiver should be compensated first from any assets recovered, and second by the petitioner.

## I.  BACKGROUND[1]

Petitioner Linda A. Cook alleges her deceased husband, Roland Cook, worked with asbestos gaskets manufactured by a distant ancestor of Reinz Wisconsin Gasket LLC (the "Company" or "RWG").[2] Petitioner has sought damages for her husband's

---

[1] Citations in the form of "Trial Tr. —" refer to the trial transcript, available at docket item ("D.I.") 70. Citations in the form "JX —" refer to the parties' joint trial exhibits. D.I. 64. Citations in the form "PTO —" refer to the parties' stipulated pre-trial order, available at D.I. 55.

[2] JX 93 ¶ 66. Whether Petitioner's husband worked with RWG's corporate ancestor's products is not for this Court to resolve.

illness and death in the United States District Court for the District of Massachusetts in an action styled *Linda A. Cook, Individually and as successor for the Estate of Roland Cook v. Foster Wheeler Energy Corp., et al.*, C.A. No. 1:21-cv-11362-RWZ (D. Mass.) (the "Massachusetts Action"),[3] alleging that Petitioner's husband was exposed to asbestos from those gaskets, and that his exposure caused his mesothelioma that caused his death.[4] That action was filed on August 19, 2021.[5] On July 27, 2022, Petitioner, as the plaintiff in the Massachusetts Action, served the Company, as a defendant, with a notice of deposition to cover topics including the assets and insurance available to satisfy any judgment in that action.[6] On August 30, the Company's counsel in the Massachusetts Action indicated that the Company

---

[3] Petitioner's husband died on March 27, 2022, during the pendency of the Massachusetts Action. JX 77; JX 93; JX 108.

[4] JX 93 ¶¶ 66, 69; JX 108; JX 121. The Company is or was a defendant in other asbestos lawsuits, including *Main v. A.F. German Co., et al.*, C.A. No. 17-3242 (Mass. Super. Ct.) (the "*Main* Action") and a South Carolina state court action styled *Welch v. 3M Company, et al.*, C.A. No. 2022-CP-40-03834 (S.C. Com. Pl.). JX 144 at RESP0007443; JX 182 [hereinafter "Wawrzyniak Tr."] at 12; JX 56; JX 65; JX 91; JX 163; JX 171. The *Welch* court granted a default judgment against RWG on November 22, 2022. JX 177; JX 180.

[5] JX 77. The then-plaintiffs in the Massachusetts Action filed an amended complaint on December 2, 2021. JX 93.

[6] JX 123.

intended to produce a Rule 30(b)(6) witness.[7]  By September 1, the Company's counsel indicated it would not.[8]

In the meantime, on August 25, the Company's sole member DCo LLC called a special meeting for August 29 for the purpose of "discuss[ing] the dissolution of Reinz Wisconsin Gasket LLC."[9]  At the meeting, DCo presented a "Wind Up Plan" for the Company.[10]  The presentation included "background" information about the Company and three possible options DCo could take regarding its windup.[11]  This background information included claims that "RWG was not capitalized" at the time of the bankruptcy, "lacks insurance" and assets, and "currently has 6 cases pending

---

[7] JX 142 at 2 (emailing on August 26, 2022: "I apologize for the delayed response, the client and NCC have been working to determine who the appropriate witness is for this deposition.  I will provide you with a date for this deposition either later today, or Monday, August 29, 2022, at the latest."); JX 152 at 2 (emailing on August 30, 2022:  "The witness is Vicki Stringham.  We will have a date for you by tomorrow.").  Vicki Stringham is Vice President, Assistant Secretary, and a director of RWG's sole member DCo LLC.  PTO ¶¶ 14–16.  She also was a director of RWG until October 2021.  *Id.* ¶ 18.

[8] Plaintiff's Motion to Compel Defendant Reinz Wisconsin Gasket LLC's Rule 30(b)(6) Deposition and Motion for Sanctions, *Linda A. Cook, Individually and as successor for the Estate of Roland Cook v. Foster Wheeler Energy Corp.*, C.A. No. 1:21-cv-11362-RWZ (D. Mass. Sept. 2, 2022), ECF No. 326, at 5–6 (describing a phone call between counsel).  I may take judicial notice of this filing under Delaware Rule of Evidence 202(d)(1)(C).

[9] JX 136.

[10] JX 144 at RESP0007442–43, RESP0007448.

[11] JX 144.

against it."[12] At least one of those cases was the Massachusetts Action.[13] The DCo board voted to dissolve RWG.[14] The next day, August 30, the Company filed its notice of dissolution and cancellation.[15] It did not take any steps to set aside assets for creditors or claimants.

Petitioner turned to this Court to appoint a receiver to determine if RWG holds any insurance policies or other assets that could satisfy a damages award in the Massachusetts Action, find RWG's dissolution was improper, and void the certificate of cancellation. On September 23, Petitioner filed a Verified Petition for Appointment of a Receiver in Dissolution Pursuant to 6 *Del. C.* § 18-805 (the "Petition") individually and as Executor of the Estate of Roland Cook.[16] Count I seeks nullification of RWG's certificate of cancellation because the Company failed to comply with Sections 18-203 and 18-804 of Delaware's Limited Liability

---

[12] *Id.* at RESP0007443, RESP0007448.

[13] Wawrzyniak Tr. 12 ("[Q:] [D]o you have an understanding that at the time Reinz filed for dissolution and cancellation that there were at least two pending asbestos disease claims against Reinz, the Cook case and the Main case? MS. FARNAN: Objection. THE WITNESS: That is my understanding.").

[14] JX 178 [hereinafter "Stringham Tr."] at 122 ("Q. Was a preliminary decision to approve the dissolution or to move forward with the process of dissolving decided at this meeting? A. No. That was decided at the board meeting."); *id.* at 41 (testifying she did not recall whether there were minutes of the August 29 board meeting where DCo voted to dissolve RWG).

[15] JX 153; JX 156.

[16] D.I. 1 [hereinafter "Pet."].

Company Act (the "LLC Act") when dissolving.[17] Petitioner alleged "[t]he dissolution and filing of the certificate of cancellation were undertaken in a bad faith attempt to avoid known claims [against the Company] that were the subject of pending litigation."[18] Count II seeks appointment of a receiver under Section 18-805 because RWG did "not complete[] its winding up process in accordance with applicable law."[19] Petitioner perfected service by publication, as required for a cancelled entity.[20] Delaware counsel entered their appearance "for Respondent

---

[17] *Id.* ¶¶ 16–18.

[18] *Id.* ¶ 19.

[19] *Id.* ¶ 22.

[20] D.I. 5; *In re VBR Agency, LLC*, 274 A.3d 1068, 1076 (Del. Ch. 2022).

Reinz Wisconsin Gasket LLC" on October 19.[21] On October 28, "Respondent Reinz Wisconsin Gasket, LLC" filed an answer to the Petition.[22]

The parties filed pretrial briefs and this matter was tried on a paper record on December 19.[23] The trial record includes over 604 joint exhibits.[24] The parties agreed that post-trial briefs and argument were not necessary, and I took this matter under advisement at the end of trial.[25] On January 12, 2023, I wrote the parties about

---

[21] D.I. 10. How the Company can retain counsel and itself appear in this action when it has been cancelled, and counsel insists it should remain cancelled, is a metaphysical wonder. *See VBR*, 274 A.3d at 1076 (noting the "idiosyncrasies" of litigating against a defunct entity, including the inability to serve through a registered agent); *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 710 (Del. 2013) (explaining a dissolved corporation "cease[s] to exist as a 'body corporate'" and can speak only through a receiver after 6 *Del. C.* § 278's three-year winding up period, which period is unique to the corporate setting); *Tratado de Libre Commercio, LLC v. Splitcast Tech., LLC*, 2019 WL 1057976, at *2 (Del. Ch. Mar. 6, 2019) ("not[ing] that the Delaware Limited Liability Company Act does not contain a three-year wind up provision comparable to 8 *Del. C.* § 278"). Plaintiff has not raised this issue, and has accepted counsel's work as being on behalf of RWG, as opposed to its former member or other live entity. *See, e.g.*, *Schwaber v. Margalit*, 2022 WL 2719952 (Del. Ch. July 13, 2022); *Schwaber v. Margalit*, C.A. No. 2021-1038-LWW, D.I. 17 (Del. Ch. Dec. 15, 2021) (entry of appearance for the defendant entity that was the general partner of one cancelled defendant entity and the managing member of another, and the president of the live defendant entity); *In re Tex. E. Overseas, Inc.* ("*TEO*"), 2009 WL 4270799, at *1 (Del. Ch. Nov. 30, 2009) (noting the dissolved corporation was "represented . . . through insurers who may have insured" the subject corporation's predecessor-in-interest), *aff'd*, 998 A.2d 852 (Del. 2010) (TABLE). For purposes of this opinion, and in view of this Court's preference to adjudicate issues on the merits, I have done the same, referring to the entity taking litigation positions as "Respondent." I ask counsel to address this issue before submitting proposed receivers.

[22] D.I. 14.

[23] D.I. 45 [hereinafter "POB"]; D.I. 46 [hereinafter "ROB"]; D.I. 50 [hereinafter "PAB"]; D.I. 51 [hereinafter "RAB"]; D.I. 66; Trial Tr.

[24] D.I. 66.

[25] Trial Tr. 132; D.I. 66.

7

the completeness of a particular trial exhibit.[26]  The parties responded certifying its completeness.[27]  My opinion follows.

## II.  ANALYSIS

Petitioner bears the burden of demonstrating good cause for the appointment of a receiver for RWG.[28]  Here, good cause in turn requires showing a reasonable likelihood that the Company violated the LLC Act.  For Petitioner to prove RWG actually violated the LLC Act during the course of its dissolution and cancellation, she must do so by a preponderance of the evidence.[29]  If an LLC has assets when it dissolves, it must set enough aside to satisfy creditors or claimants in pending actions:  an LLC can dissolve in compliance with the LLC Act without doing so only if it had no assets.[30]

For the following reasons, I conclude Petitioner has demonstrated good cause to appoint a receiver because it is reasonably likely RWG violated the LLC Act by filing its notice of dissolution and cancellation while failing to set aside its assets to provide for the pending lawsuits to which it was a party.  I defer my decision on whether to nullify the Company's certificate of cancellation until the receiver

---

[26] D.I. 69.

[27] D.I. 71; D.I. 72.

[28] 6 *Del. C.* § 18-805.

[29] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015).

[30] 6 *Del. C.* § 18-804.

8

submits a report: at that point I will consider whether the report, together with the material provided at trial, demonstrates by a preponderance of the evidence that RWG had assets that it failed to set aside for pending claims.

### A. Petitioner May Apply To Appoint A Receiver.

Under Section 18-805, when an LLC cancels its certificate of formation under Section 18-203, the Court of Chancery may, on application of any creditor, any manager, any member, or "any other person who shows good cause therefor," appoint a receiver.[31] As an initial matter, the parties dispute whether Petitioner has standing to seek a receiver under this language. Petitioner asserts she is a creditor due to her pending Massachusetts Action. Alternatively, she contends she can establish good cause and therefore satisfies Section 18-805. I do not agree that she is a creditor, but I agree she has established good cause and therefore has standing to apply for the appointment of a receiver. Petitioner has demonstrated it is reasonably likely that (i) RWG has assets in the form of additional insurance policies so (ii) RWG failed to follow Section 18-804 in its dissolution and cancellation by failing to set aside provisions for the pending litigations under 18-804(b)(2).

---

[31] *Id.* § 18-805.

9

### 1.    Petitioner Is Not A Company Creditor.

Petitioner is not a creditor for purposes of Section 18-805, which permits creditors of a limited liability company to seek a receiver over the company.[32] Black's Law Dictionary defines "creditor" as "[o]ne to whom a debt is owed; one who gives credit for money or goods."[33]   Section 18-804(a)(1) requires a limited liability company to distribute assets to creditors upon winding up.[34]   By contrast, Section 18-804(b)(2) requires a dissolving limited liability company to "make such provision as will be reasonably likely to be sufficient to provide compensation for any" pending claims.[35]   While the Company must make provision for Petitioner's pending claims in its dissolution proceedings, it does not have a present and outstanding obligation to pay Petitioner.[36]   Unless and until Petitioner's claim in the Massachusetts Action is reduced to judgment, RWG does not "owe" Petitioner money, and so Petitioner is not a creditor.

Petitioner argues she is a creditor, pointing to *Follieri Group, LLC v. Follieri/Yucaipa Investments*.[37]   In *Follieri*, "a mere putative general creditor"

---

[32] *Id.*

[33] Creditor, *Black's Law Dictionary* (11th ed. 2019).

[34] 6 *Del. C.* § 18-804(a)(1).

[35] *Id.* § 18-804(b)(2).

[36] *Id.*

[37] 2007 WL 2459226 (Del. Ch. Aug. 23, 2007).

moved to intervene in a dissolution proceeding, asserting the dissolution could adversely affect its ability to collect its debt, which it was also seeking to recover in a separate federal action.[38] The Court pointed out that "the interests of creditors such as [the movant] are fully protected" in dissolution proceedings, and denied intervention because, among other reasons, "[m]erely having a claim for payment of money allegedly owed does not give [the attempted intervenor] an interest in the LLC itself or in an action to dissolve the LLC."[39] *Follieri* does not speak to what makes someone a creditor.[40] I do not read its references to the movant as both a "putative general creditor" with "alleged debt," and as a "creditor" protected in dissolution proceedings, to go so far as to categorize anyone seeking a recovery in a pending action to be a "creditor" for purposes of the LLC Act's dissolution proceedings. *Follieri* does not offer any proposition that labels Petitioner a creditor under Sections 18-804(a) and 18-805.

---

[38] *Id.* at *1.

[39] *Id.*

[40] *See In re Interstate Gen. Media Hldgs., LLC*, 2014 WL 1364938, at *4 (Del. Ch. Apr. 7, 2014) ("In *Follieri*, the court denied a 'mere putative creditor['s]' attempt to intervene in the dissolution of an LLC because the claim on which the LLC was indebted to the creditor 'ha[d] nothing to do with' the question presented in the dissolution action, namely, 'whether or not it [wa]s reasonably practicable to carry on the business of the LLC in conformity with its limited liability company agreement.'" (quoting *Follieri*, 2007 WL 2459226, at *1)).

11

The door is not yet closed to Petitioner; as "any person," she has standing to apply for a receiver under Section 18-805 if she can show good cause for doing so.

**2.      Petitioner Has Shown Good Cause To Appoint A Receiver Because It Is Reasonably Likely RWG Had Assets When It Cancelled Its Certificate In Violation Of Section 18-804.**

Section 18-805 contemplates that "any other person who shows good cause therefor" may apply to this Court for the appointment of a receiver.[41]  This opinion concludes that for Petitioner, as a person other than a creditor, manager, or member, to demonstrate good cause to appoint a receiver, she must show that it is reasonably likely that RWG had assets when it cancelled its certificate of formation.  Based on the evidence in the record, I conclude it is reasonably likely that it did.

**i.      Good Cause To Appoint A Receiver Under Section 18-805 Requires More Than Speculation, Or A "Mere Specter," Of A Statutory Violation.**

The parties disagree on what showing amounts to "good cause."  Both appear to agree that, in this instance, "good cause" means "good cause to suspect a statutory violation in dissolution."  And both appear to agree that, if RWG had assets at the time of its dissolution, it would have violated LLC Act Section 18-804(b)(2) for failing to set aside those assets to provide for pending actions.  Through that lens, the dispute is as to Petitioner's burden to demonstrate RWG had assets at that time.  Respondent argues "'good cause' requires a reasonable likelihood that Reinz

---

[41] 6 *Del. C.* § 18-805.

12

possesses an actual asset that could benefit a creditor."[42] Petitioner argues she need not prove that assets exist, but rather, "only . . . that there is 'the specter' of assets to which Reinz may be entitled."[43] I read the common law to support Respondent's view.

In *In re Texas Eastern Overseas, Inc.*, this Court acknowledged "[t]he good cause standard of [8 *Del. C.*] § 279 [the corporate analogue to Section 18-805] is not defined."[44] The petitioner in *Texas Eastern* sought contribution from the dissolved corporation in a pending federal action, and sought the appointment of a receiver for the particular purpose of pursuing potential insurance coverage under Section 279's opportunity for "any other person who shows good cause" for their application.[45] As here, the respondent in *Texas Eastern* maintained the company had no assets and that the petitioner had "done nothing more than put forth the unsupported allegation

---

[42] ROB at 23.

[43] POB at 18 (quoting *Rosenbloom v. Esso Virgin Islands*, 766 A.2d 451, 459 (Del. 2000)).

[44] 2009 WL 4270799, at *5 n.39 (citing *In re Dow Chem. Int'l Inc. of Del.* ("*Dow I*"), 2008 WL 4603580 (Del. Ch. Oct. 14, 2008), and *In re Dow Chem. Int'l Inc. of Del.* ("*Dow II*"), 2008 WL 4989069 (Del. Ch. Nov. 18, 2008)). 8 *Del. C.* § 279 is the corporate equivalent of 6 *Del. C.* § 18-805. *Coyne v. Fusion Healthworks, LLC*, 2019 WL 1952990, at *9 (Del. Ch. Apr. 30, 2019) (applying *Dow I* to the analysis of a claim brought under Section 18-805); *see also Matthew v. Laudamiel,* 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) ("Since the wording and context of these two statutory provisions are essentially identical, authorities interpreting § 279 are persuasive when interpreting § 18-805." (footnote omitted)).

[45] 8 *Del. C.* § 279.

13

that some undefined insurance asset exists from which [the petitioner] may recover."[46]

*Texas Eastern* stated definitively that "a petitioner has not shown good cause under § 279 if it does no more than speculate that the dissolved corporation may still have undistributed assets."[47]  The Court mused:

> Conversely, a standard akin to a preponderance of the evidence would require the Court to delve too deeply into the merits of a dispute that would be better resolved elsewhere.  There must be a purpose for appointment of a receiver—a problem or opportunity to be resolved or pursued, and a reasonable likelihood that some positive outcome would result.  In this instance, good cause depends upon a reasonable likelihood that there would be an asset available to the receiver that would benefit a creditor-claimant. . . . Similarly, the claim to be satisfied—at least in part—through the receiver's efforts must be facially plausible.  The proceeding for appointment of a receiver does not efficiently serve as a mechanism for resolving what may prove to be difficult and complex legal or factual contentions associated with the merits of any creditor's claim against the assets that may be available to the receiver.  In addition, it is not an efficient venue for resolving whether a receiver has any definitive claim to the asset.  Ultimately, good cause depends upon the perception that appointment of a receiver is likely to be-in a broader sense-worth the effort.[48]

Ultimately, *Texas Eastern* framed the question as whether the petitioner "has provided sufficient grounds for the Court to conclude that it is reasonably likely [the respondent] continues to hold undistributed assets."[49]  *Texas Eastern* disposes of

---

[46] *TEO*, 2009 WL 4270799, at *2 (internal quotation marks and footnote omitted).

[47] *Id.* at *4 (footnote omitted).

[48] *Id.* at *5 n.39.

[49] *Id.* at *4.

Petitioner's argument that she need only show a "specter" of assets.[50] I adopt its "reasonably likely" standard for Section 18-805's good cause standard here.

For the reasons that follow, I conclude Petitioner has met this threshold.

### ii. It Is Reasonably Likely RWG Had Assets When It Was Dissolved.

Based on the evidence presented at trial, Petitioner has demonstrated good cause to believe that RWG holds assets, including one or more insurance policies issued to one of its corporate ancestors. Delaware courts have recognized insurance policies are assets of a dissolved company.[51] Here, Petitioner has identified four potential sets of policies as possible assets: (i) unidentified prepaid insurance policies; (ii) Aetna workers' compensation policies; (iii) primary coverage policies underwritten by Lumbermens (or Kemper, both defined below); and (iv) excess coverage policies underwritten by CNA Insurance Companies.

---

[50] *Id.* at *6 ("AmeriPride has demonstrated a reasonable likelihood, well beyond mere speculation, that TEO has undistributed assets in the form of rights under one or more insurance policies."); *id.* at *4 ("*Dow I* and *II* instead teach that a petitioner has not shown good cause under § 279 if it does no more than speculate that the dissolved corporation may still have undistributed assets." (footnote omitted)). Petitioner cites *Rosenbloom v. Esso Virgin Islands* for the proposition that Petitioner must only show a "specter" of assets. POB at 18 (quoting *Rosenbloom*, 766 A.2d at 459). *Rosenbloom* did not establish a "specter of assets" standard; it uses the word "specter" once with regard to a personal financial interest by the original trustees in the context of evaluating whether the trial court erred in replacing those trustees of a liquidating trust because of potential conflicts of interest. 766 A.2d at 459. It does not have to do with Section 18-805, dissolving, or winding up limited liability companies.

[51] *See, e.g.*, *Krafft-Murphy*, 82 A.3d at 704 (citing *TEO*, 2009 WL 4270799, at *6).

15

Petitioner has demonstrated it is reasonably likely RWG still had unidentified prepaid insurance policies, the Aetna policies, and the CNA Insurance Companies' policies at the time of its dissolution and cancellation. My analysis follows the path of the Delaware entity that became Reinz Wisconsin Gasket, LLC and its insurance policies. I have done my best to chart that path for an audience broader than the parties, but my best may not be good enough. The graphic below shows the Company's history as I see it, with bolded entities holding certain insurance policies.



16

### a. RWG's Family Tree From 1943–2005

Wisconsin Gasket & Manufacturing Co. ("WG&M") was established in 1943 and incorporated in 1944.[52] WG&M manufactured gaskets allegedly containing asbestos that Petitioner's husband allegedly used at work.[53] WG&M had primary insurance coverage from Kemper Insurance Company ("Kemper"), which would be called Lumbermens Mutual Casualty Company ("Lumbermens"), and excess coverage policies underwritten by CNA Insurance Companies (the "CNA Policies").[54] The CNA Policies cover November 22, 1977 through December 5,

---

[52] JX 193 ("In 1943 a manufacturing company was created to supply gaskets to the production lines of Milwaukee's war plants."); JX 107 at RESP0000088; JX 1 (reflecting WG&M filed its articles of incorporation with the Wisconsin Department of State on December 28, 1944).

[53] JX 93 ¶ 66.

[54] Stringham Tr. 167 ("[Q.] And the date for submitting a claim for the insolvency of Lumbermens – which also included Kemper, right? A. Yes, I believe so."); JX 88 at RESP0002725 ("General Liability with Kemper Insurance and/or other Lumbermens Affiliated Companies – As referenced in the first paragraph, we have found extensive corporate documentation showing that Wisconsin Gasket & Manufacturing Company and Reinz Wisconsin Gasket Company purchased general liability coverage from Kemper Insurance. . . . Through 1990, the Reinz Wisconsin Gasket Company records continued to reference Kemper Insurance as the company's general liability insurer. Stanley Strelka of Professional Insurance Services, the company's insurance broker through the mid to late 1980s, recently confirmed the lengthy relationship with Kemper Insurance."); JX 85 at RESP0007603 (showing "Lumbermens" policies dating back to 1960); JX 94 at RESP0003414 (identifying the primary insurer as "Lumbermens/Kemper"); Trial Tr. 121 ("Kemper is a Lumbermens' affiliate"); JX 8 at RESP0003400 ("With regard to insurance coverage, I am enclosing a copy of Policy 914-85-06 which provided us with excess indemnity coverage from 11/22/77 through 09/20/78. I am unable to find a copy of Policy 142-74-37 which was in effect from 09/20/78 through 12/05/78. Our underlying carrier is the Kemper Insurance Company who has been our principal carrier for more than fifteen years."); JX 10 at RESP0003402 ("We have an excess policy RDX 9148506 with a term

17

1978.[55] Petitioner's husband was allegedly exposed to asbestos in gaskets from 1964 through 1968, and again from 1976 through 1989.[56] The Massachusetts Action alleges Petitioner's husband's exposure to asbestos-containing products WG&M or Wisconsin Gasket DE manufactured occurred during the latter period.[57]

In 1981, WG&M split into two entities named Wisconsin Gasket & Manufacturing—one incorporated in Wisconsin, and one incorporated in Delaware ("Wisconsin Gasket DE")—with Wisconsin Gasket DE purchasing the Wisconsin

---

of November 22, 1977 to September 20, 1978, with $4 million aggregate coverage. The primary is Kemper and they have a $500,000 each occurrence and $500,000 aggregate coverage. Our insured also claims to have a policy 1427437 from September 20, 1978 to December 5, 1978 . . . ."); *see also* JX 13 at RESP0003411 ("We are in possession of the excess third party liability policy number 914-85-06, forwarded by you effective November 22, 1977 through September 20, 1978. Please provide us with a copy of policy #142-74-37.").

[55] *E.g.*, JX 8 at RESP0003400 ("With regard to insurance coverage, I am enclosing a copy of Policy 914-85-06 which provided us with excess indemnity coverage from 11/22/77 through 09/20/78. I am unable to find a copy of Policy 142-74-37 which was in effect from 09/20/78 through 12/05/78."); JX 10 at RESP0003402 ("We have an excess policy RDX 9148506 with a term of November 22, 1977 to September 20, 1978, with $4 million aggregate coverage. . . . Our insured also claims to have a policy 1427437 from September 20, 1978 to December 5, 1978 . . . ."); JX 13 at RESP0003411 ("We are in possession of the excess third party liability policy number 914-85-06, forwarded by you effective November 22, 1977 through September 20, 1978. Please provide us with a copy of policy #142-74-37."); *see also* JX 12 at RESP0003403 (notifying "Wisconsin Gasket and Manufacturing Company" about its CNA insurance policies); JX 75 at RESP0004292–93 (notifying Enstar personnel of documents Stringham "found that provide either policy numbers, reference to insurance carriers (CNA & Kemper) as well as letters with various CNA contacts").

[56] JX 93 ¶¶ 65–66.

[57] *Id.* ¶ 66.

entity's assets.[58] Wisconsin Gasket DE held the Kemper policies and CNA Policies after the 1981 split.[59] This is reflected by 1982 and 1983 communications about the CNA Policies between Wisconsin Gasket DE and CNA Insurance Companies, including a letter dated February 23, 1982.[60] Wisconsin Gasket DE repeatedly represented to CNA Insurance Companies that Kemper Insurance Company was its primary carrier.[61] I find these contemporaneous communications between Wisconsin Gasket DE and CNA Insurance Companies in 1982 and 1983—and closest temporally to the 1981 transaction—to be the best evidence that the Company's predecessor held the CNA Policies in that transaction.

---

[58] JX 7.

[59] JX 8 at RESP0003400 ("Our underlying carrier is the Kemper Insurance Company who has been our principal carrier for more than fifteen years."). The February 23, 1982 letter was written on letterhead including "Wisconsin Gasket and Manufacturing Co." and "Member of Reinz Group." *Id.* It was signed by "L.A. Barndt[,] President." *Id.* at RESP0003401. Wisconsin Gasket DE's April 1983 letter was also signed by "L.A. Barndt[,] President." JX 13 at RESP0003405, RESP0003409.

[60] *E.g.*, JX 8 at RESP0003400; JX 12 at RESP0003403–04; JX 13 at RESP0003405–13.

[61] JX 8 at RESP0003400 ("Our underlying carrier is the Kemper Insurance Company who has been our principal carrier for more than fifteen years."); JX 10 at RESP0003402 ("The primary is Kemper and they have a $500,000 each occurrence and $500,000 aggregate coverage."); JX 88 at RESP0002725 ("Said insurance may have been purchased from Kemper and/or other Lumbermens-affiliated companies all the way back to the incorporation of Wisconsin Gasket & Manufacturing Company in 1944. At minimum, we have strong reason to believe that the relationship with Kemper Insurance went back at least to 1960. Through 1990, the Reinz Wisconsin Gasket Company records continued to reference Kemper Insurance as the company's general liability insurer.").

19

In 1985, Wisconsin Gasket DE changed its name to Reinz Wisconsin Gasket Company ("RWGC").[62] Five years later, in the face of litigation, RWGC disavowed the CNA Policies by asserting that it did not "acknowledge" the pre-1981 liabilities being litigated.[63] By letter dated August 23, 1990, CNA Insurance Companies wrote to RWGC to follow up on the February 23, 1982 letter referenced above to CNA Insurance Companies about a pending asbestos claim Wisconsin Gasket DE had represented it was defending.[64] On September 18, RWGC responded, asserting that it "did not acknowledge that any pre-1981 liabilities are [RWGC's]," implying it also did not recognize the CNA Policies as its own because they belonged to the "Wisconsin corporation" from which RWGC had split.[65] CNA Insurance Companies responded by letter dated September 26, asking again about RWGC's "asbestos bodily injury lawsuits," since CNA Insurance Companies already knew of one from 1982.[66] On October 22, RWGC replied to CNA Insurance Companies and identified three lawsuits in which either "Wisconsin Gasket" or then-Wisconsin Gasket DE was a party: (i) the first lawsuit "was dismissed with nothing paid on

---

[62] JX 16; JX 28 at 2; JX 193.

[63] JX 23 at RESP0004299; JX 24 at RESP0004298.

[64] JX 13 at RESP0003411–12; JX 8 at RESP0003400 ("This case is being defended by the law firm:  Groham, Metge, Bowman & Hourigan."); *see also supra* note 59.

[65] JX 23 at RESP0004299.

[66] JX 13 at RESP0003413.

behalf of Wisconsin Gasket by Kemper";[67] (ii) the second lawsuit "an asbestos bodily injury case[,] was settled with Kemper paying $20,000 on behalf of Wisconsin Gasket"; and (iii) the third lawsuit "an asbestos bodily injury case, remains open. Since [the plaintiff's] exposure predates 1981 we have moved for dismissal as the successor corporation."[68]

Respondent asks the Court to read those 1990 letters to CNA Insurance Companies as evidence that the CNA Policies are not Company assets because Wisconsin Gasket DE did not acquire pre-1981 liabilities in the 1981 split.[69] It is not clear from the face of the October 1990 letter whether the "Wisconsin Gasket" mentioned was the Delaware corporation, or the Wisconsin corporation.[70] But it is plausible that by 1990, RWGC was trying to push all pending litigation on to the Wisconsin entity.

---

[67] The first lawsuit, "Lopez v. Manville, et al[.], the case that was open in 1982," is likely the same case that Wisconsin Gasket DE and CNA Insurance Companies referenced in their 1982 correspondence. JX 8 at RESP0003400; Trial Tr. 118; *id.* 119 ("And JX 604 is the docket of the *Lopez* case, which shows that the complaint was filed on January 28th, 1981, which is before the asset purchase closed, meaning that the Wisconsin company had to be the named defendant there, and the notice to CNA was a notice of a claim against the Wisconsin company."); JX 604 at 76.

[68] JX 24 at RESP0004298.

[69] Trial Tr. 119, 121; *see also* ROB at 10–11; RAB at 21–22.

[70] JX 24 at RESP0004298.

21

In 1994, Dana Corporation ("Dana Corp.") acquired RWGC as a wholly owned subsidiary.[71] In 2006, RWGC entered into a merger to become the Company at issue, Reinz Wisconsin Gasket, LLC.[72]

### b. RWG's Bankruptcy Reflects RWG Held Prepaid Insurance.

In 2006, Dana Corp. and RWG filed for Chapter 11 bankruptcy.[73] RWG filed a list of its known assets in schedules.[74] Schedule B asked RWG as the debtor to list "[i]nterests in insurance policies" and "[n]ame [the] insurance company of [each] policy and itemize surrender or refund value of each."[75] For "Description and Location of Property," RWG listed "See Exhibits B-9a and B-9b immediately following Schedule B."[76] For "Net Book Value of Debtor's Interest in Property, Without Deducting Any Secured Claim or Exemption," RWG listed "$47,936."[77] On Exhibit B-9a, for "Description," RWG listed "Prepaid Insurance," and under "Net Book Value," RWG listed "$47,936."[78] In a footnote, RWG stated: "In addition to the insurance policies listed on this Schedule, the Debtor may have rights

---

[71] JX 26.

[72] JX 31.

[73] JX 32; JX 40 at RESP0002103.

[74] JX 33.

[75] *Id.* at RESP0000216 (capitalization altered).

[76] *Id.* (capitalization altered).

[77] *Id.* (capitalization altered).

[78] *Id.* at RESP0000220 (capitalization altered).

22

to coverage under certain other insurance policies listed in Schedule G for this Debtor."[79]  Exhibit B-9a does not list or attach a list of policies.  Exhibit B-9b does not exist.[80]  Schedule G does not include insurance policies.[81]

In 2007, the bankruptcy court confirmed the Third Amended Joint Plan of Reorganization of Dana Corp. and its subsidiaries, including RWG (the "Reorganization Plan").[82]  Under the Reorganization Plan, RWG transferred its operating assets and real estate to another Dana Corp. subsidiary.[83]  The bankruptcy court recognized RWG as solvent even after it transferred its operating assets and real estate, pointing to insurance policies as assets.[84]

Thus, Petitioner has demonstrated a reasonable likelihood that RWG had prepaid insurance when it filed its notice of cancellation, as identified in its bankruptcy filings and the bankruptcy court's explanation that the Company was solvent because it held those policies.  While this prepaid insurance was inapplicable to third-party asbestos personal injury actions like Petitioner's, it is still an asset that

---

[79] *Id.*

[80] I wrote to the parties asking them to submit any attachments or other exhibits to Schedule B or certify that they do not exist.  D.I. 69.  The parties responded in separate letters certifying that the requested documents do not exist.  D.I. 71; D.I. 72.

[81] JX 33 at RESP0000250.

[82] JX 40 at RESP0002013–14.

[83] JX 41 at ENT000167; JX 44; Trial Tr. 109.  The record does not reveal what these operating assets were.

[84] *See* JX 40 at RESP0002041; JX 37 at RESP0003254.

RWG would have had to set aside for other claimants and creditors under Section 18-804, such that immediate cancellation would have violated the LLC Act.[85]

RWGC also had four Aetna workers' compensation policies dating before its bankruptcy and after the 1981 split.[86]  Their policy periods span September 1, 1986 through September 1, 1990, which overlap the asbestos exposure windows in the pending actions.[87]  RWG did not identify those policies as assets in its bankruptcy petition or in the special meeting in which it was dissolved.[88]  It is reasonably likely

---

[85] ROB at 5; JX 33 at RESP0000220; Stringham Tr. 174 ("[Q.]  And you see that there is an attachment here that it's pre-paid insurance?  A.  Yes.  Q.  Now, to be fair, you investigated that and that's workers' comp type insurance, right?  A.  Right.  Something that would have been allocated by Dana Corporation.  Q.  But this does demonstrate that Reinz Wisconsin had some types of insurance at the time of the bankruptcy, correct?  A. At the time of the bankruptcy, yes, they did.  Q.  That insurance doesn't apply because it was for workers' comp and not for third-party claims?  A.  Correct.").

[86] JX 128; JX 129; JX 130; JX 131.  Travelers Casualty & Surety Company produced these policies to Petitioner in the Massachusetts Action in response to a subpoena Petitioner filed in that action.  JX 126 at 2 (requesting Travelers produce "[a]ll insurance policy agreements, applications for insurance, correspondence, and other related documents for Aetna Casualty and Surety Company ('Aetna') and Reinz Wisconsin Gasket Company (a/k/a Reinz Wisconsin Gasket & Mfg. and/or Wisconsin Gasket & Manufacturing Company), including, but not limited to, Aetna Policy Nos. 36CW428449CAA (9/111986-9/1/1987), 36CW504034CAA (9/1/1987-9/111988), 36CW544640CAA (9/1/1988-9/1/1989), and 36CW565866CAA (9/1/1989-3/1/1990)").

[87] JX 131 (covering a policy period from September 1, 1986 through September 1, 1987); JX 130 (covering a policy period from September 1, 1987 through September 1, 1988); JX 129 (covering a policy period from September 1, 1988 through September 1, 1989); JX 128 (covering a policy period from September 1, 1989 through September 1, 1990); JX 93 ¶ 66 (alleging Roland Cook was exposed to asbestos-containing products manufactured by Respondent from 1976–1989); JX 171 ¶¶ 91, 93, 95–100, 102 (alleging Melvin Welch was exposed to asbestos from the early 1960s to the mid-late 2000s); JX 91 ¶ 8 (alleging Billy Main was exposed to asbestos from 1978–2003).

[88] JX 33 at RESP0000216, RESP0000220; JX 144 at RESP0007443, RESP0007448.

RWG still had the four Aetna policies when it dissolved during the pendency of litigation.

### iii. Lumbermens' Liquidation Forecloses Lumbermens Policies As Assets.

In 2013, the Company's primary insurer, Lumbermens, went into liquidation.[89] The claims deadline was November 10, 2014.[90] RWG did not file any claims before the claims deadline because, according to DCo, there were no pending claims against the Company at the time.[91] Because Lumbermens went through liquidation and RWG did not file any claims by the deadline for doing so, I conclude it is not reasonably likely that any Lumbermens policy was a source of assets for claims against RWG at the time it filed its notice of cancellation.

### iv. An Insurance Arbitrageur Acquires RWG, And Policies Are Found And Investigated.

Enstar Group Limited "acquire[s] (re)insurance companies and legacy manufacturing companies with direct exposure to asbestos and environmental liabilities . . . , which are either in run-off or can be placed into run-off following [Enstar Group Limited's] acquisition."[92] It "receive[s] investment returns from the

---

[89] JX 45; JX 144 at RESP0007443.

[90] JX 58 at RESP0003125.

[91] Stringham Tr. 168 ("Q. All right. And did Reinz Wisconsin from emergence from bankruptcy up through 2014, did Reinz Wisconsin Gasket have any claims that it could have submitted to the insolvency for, or whatever it was, in Illinois? A. No, we did not.").

[92] JX 114 at RESP0002479.

investment of the assets acquired with these companies, which [Enstar Group Limited] use[s] to settle the liabilities acquired and may take many years to complete."[93]  In 2016, an Enstar Group Limited subsidiary, Enstar Holdings (US) Inc. acquired Dana Corp.'s interest as the sole member of Dana Companies, LLC, and RWG; Dana Companies, LLC remained as RWG's sole member.[94]  Following the acquisition, Dana Companies, LLC and Enstar (US) Inc. ("Enstar"), a wholly-owned subsidiary of Enstar Holdings (US) Inc.,[95] became parties to an administrative services agreement whereby Enstar employees render certain services to Dana Companies, LLC.[96]  Dana Companies, LLC would change its name to DCo LLC.[97]

In June 2021, DCo found copies of the CNA Policies while cleaning out an office.[98]  The next month, DCo, on RWG's behalf, hired an insurance archivist to try to locate insurance policies that would cover the Company.[99]  In September 2021, DCo gave the archivist the documents it had related to the CNA Policies to aid his

---

[93] *Id.*

[94] PTO ¶¶ 5–6; JX 54 at RESP0002391, RESP0002449; JX 52; *see also* JX 51.  As of 2014, RWG's sole member was Dana Companies, LLC.  JX 46 at RESP0003130; *cf.* PTO ¶ 5.

[95] JX 54 at RESP0002449.

[96] JX 53.

[97] JX 59.

[98] JX 75 at RESP0004292–93; Stringham Tr. 83–84, 86; PTO ¶ 32.

[99] JX 76; Wawrzyniak Tr. 28–29, 39; Stringham Tr. 83.

search.[100]  Thus, RWG's member's internal communications reflect the renewed perception that the CNA Policies were possible assets.[101]

In October 2021, the archivist sent a status update to DCo and Enstar.[102]  The archivist contacted Stanley B. Strelka, who was Wisconsin Gasket DE's insurance broker.[103]  Strelka gave the archivist leads on workers' compensation policies, Lumbermens' policies dating back to 1960, and names of other contacts who might have more information.[104]

In December 2021, the archivist sent another status update on his "research efforts," recommending that once DCo and Enstar "ha[d] an opportunity to review and consider," they "reconvene sometime perhaps next week to consider next steps."[105]  The archivist informed DCo and Enstar the "Lumbermens Liquidator" located archival copies of "Lumbermens/Kemper" policies "from the critical years of interest," 1968 through 1979, and while "[t]he policies all clearly show that they

---

[100] JX 82 at RESP0003398–3413.

[101] *See* JX 75 at RESP0004293 ("We've always suspected RWG had insurance coverage when they were acquired by Dana.").

[102] JX 85 at RESP0007602.

[103] JX 88 at RESP0002725 ("Stanley Strelka of Professional Insurance Services, the company's insurance broker through the mid to late 1980s, recently confirmed the lengthy relationship with Kemper Insurance."); JX 8 at RESP0003401; JX 13 at RESP0003406–07, RESP0003410; JX 85 at RESP0007602–03.

[104] JX 85 at RESP0007602–03.

[105] JX 94 at RESP0003414.

were subject to facultative reinsurance,"[106] he did not see clear reference to who the reinsurer might be.[107] The status update does not explain what happened to, or even mention, the CNA Policies.[108] The attachments to the archivist's status email are not included as joint exhibits.

In that email, the archivist suggested more digging to confirm a reinsurance relationship.[109] Some of this digging included connecting with a "German attorney who [RWG's] broker indicated had facilitated the reinsurance between Lumbermens and Hannover given the then ownership by a German company."[110] When the archivist did not hear back from the German attorney, he suggested contacting a German RWG affiliate, and another possible next step.[111]

---

[106] *Brit. Ins. Co. of Cayman v. Safety Nat. Cas.*, 335 F.3d 205, 212 n.4 (3d Cir. 2003) ("There are two types of reinsurance – facultative and treaty. 'Facultative reinsurance covers only a particular risk or a portion of it, which the reinsurer is free to accept or not.' 'Treaty insurance obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding insurance company underwrites.'" (citations omitted) (citing and quoting *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 271 (2d Cir. 1992))).

[107] JX 94 at RESP0003414; JX 2 (umbrella Lumbermens policy covering September 20, 1968 through September 20, 1971); JX 3 (umbrella Lumbermens policy covering September 20, 1971 through September 20, 1974); JX 4 (umbrella Lumbermens policy covering September 20, 1974 through September 20, 1977); JX 5 (workers compensation Lumbermens policy covering May 1, 1978 through May 1, 1979); JX 93 ¶ 66 (alleging Roland Cook was exposed to asbestos-containing products manufactured by WG&M, Wisconsin Gasket DE, or RWGC from 1976–1989).

[108] JX 94.

[109] *Id.* at RESP0003414.

[110] *Id.*

[111] *Id.* at RESP0003414–15; *see also* Trial Tr. 47.

28

Enstar responded to the December update in January 2022, setting up a call between Enstar, DCo, and the archivist at the end of the month.[112] After the archivist sent his February 11 invoice, DCo and Enstar emailed back and forth, with DCo asking "[a]re we done with this investigation? I do not have additional money budgeted for [the archivist]" and "[h]ave you called off [the archivist]? He seems the type to keep looking."[113] On February 14, Enstar told the archivist to "please stand down with any other work."[114] The record does not reveal that RWG or DCo picked up where the archivist left off and followed his leads. Neither the record nor counsel has explained why the archivist did not pursue the CNA Policies.

Petitioner argues RWG has "potential[]" derivative claims against its officers covered by D&O insurance policies Enstar maintained for all DCo entities, and potential claims against Enstar for violation of the 2016 purchase agreement by which Enstar acquired DCo and RWG.[115] Because I have found it is reasonably likely that RWG has other assets in the form of insurance policies, I need not reach the likelihood that it holds these particular assets.[116]

---

[112] JX 105.

[113] JX 104.

[114] JX 105 at RESP0007934.

[115] POB at 25–26.

[116] *See TEO*, 2009 WL 4270799, at *5 n.39 (noting that under 8 *Del. C.* § 279's good cause standard, "[t]he proceeding for appointment of a receiver does not efficiently serve as a mechanism for resolving what may prove to be difficult and complex legal or factual

29

### v. RWG Counts Its Own Assets Before Dissolving.

At the August 29 special meeting, DCo presented a "Wind Up Plan" for RWG.[117] The presentation had a slide titled "Reinz Wisconsin Gasket LLC Background," which included bullet points such as:

- "RW[G] lacks insurance (following the liquidation of Lumbermens Mutual Casualty Company) and has no assets."[118]
- "At the time of the bankruptcy, RWG was not capitalized."[119]
- "Lumbermens Mutual Casualty Company is the sole insurance provider and was placed in liquidation by an Illinois court in 2013."[120]

A slide titled "Future Wind-Up Plan," included a bullet point for "Confirmed lack of assets or insurance available."[121]

---

contentions associated with the merits of any creditor's claim against the assets that may be available to the receiver.").

[117] JX 144.

[118] *Id.* at RESP0007443.

[119] *Id.* Although, on April 13, 2022, DCo's president sent an email to Enstar, with the subject "Reinz Wisconsin Gasket," explaining: "Pursuant to Dana Corporation's Reorganization (attached), the operating subsidiaries [including then-RWGC] 'will be solvent and left with sufficient assets, liquidity and capital to satisfy their obligations as they come due for the foreseeable future.'" JX 113 at RESP0003166 (quoting JX 40).

[120] JX 144 at RESP0007443.

[121] *Id.* at RESP0007448. In support of this assertion, Respondent briefed that DCo undertook due diligence to inquire as to "whether Reinz had any outstanding accounts receivable, creditors, assets, outstanding loans payable or receivable, open bank accounts, real property or leases, regulatory licenses, intellectual property, employees, websites, or registered domains." ROB at 12 (citing JX 137, JX 138, JX 140, JX 141, JX 148, JX 149, JX 150, JX 154, JX 160); *see also* ROB at 24–25 (citing JX 137, JX 138, JX 140 JX 148, JX 149, JX 154). Insurance is noticeably absent from this list.

### vi. It Is Reasonably Likely RWG Holds CNA Policies That Would Cover Petitioner's Claims.

The parties join issue most intensely on whether the record supports the conclusion that RWG holds the CNA Policies. Based on the foregoing, it is reasonably likely the CNA Policies were transferred from WG&M to Wisconsin Gasket DE in 1981, to RWGC in 1985, and then to RWG in 2006, and remained with RWG through several acquisitions, a bankruptcy, and its 2022 dissolution.

In its pretrial briefing, Respondent renewed the 1990 argument that because Wisconsin Gasket DE acquired assets only in 1981, and not liabilities, it did not acquire the pre-1981 policies and could not hold them as assets.[122] At trial, Respondent substantially narrowed its argument about the effect of the 1981 transaction, and no longer argued that Wisconsin Gasket DE was uninsured after that transaction: Respondent claimed that two of the three lawsuits were against the Wisconsin corporation, and while the third was against Wisconsin Gasket DE, it relied on pre-1981 liabilities that purportedly stayed with the entity.[123] Because documents immediately after the 1981 transaction reflect both the CNA Policies and the Lumbermens/Kemper policies, I give no consideration to the argument that Wisconsin Gasket DE exited that transaction uninsured.

---

[122] ROB at 3, 10–11, 25 n.5; RAB at 3, 21–22; *id.* at 21 n.14.

[123] Trial Tr. 119–21.

### vii. It Is Reasonably Likely RWG Violated Section 18-804 When It Filed Its Notice Of Dissolution And Cancellation.

Thus, it is reasonably likely that RWG held the CNA Policies and Aetna policies at the time of its dissolution. Petitioner has demonstrated a reasonable likelihood that RWG violated Section 18-804(b) when it dissolved because it did not set aside any assets for claimants in actions pending during its dissolution or any future claims. Section 18-804(b)(2) requires limited liability companies which have dissolved to

> make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the limited liability company which is the subject of a pending action, suit or proceeding to which the limited liability company is a party . . . .

RWG knew Petitioner, as the plaintiff in the Massachusetts Action, was one of at least six claimants under Section 18-804(b)(2) when it dissolved.[124] There is no indication RWG made any provisions to provide compensation for any of the pending claims against it under Section 18-804(b)(2), let alone for "claims that have not been made known" to RWG under Section 18-804(b)(3).[125] Petitioner has demonstrated it is reasonably likely RWG violated Section 18-804(b).

Based on the foregoing, Petitioner has demonstrated good cause to appoint a receiver. She has shown it is reasonably likely that RWG had both assets and actions

---

[124] JX 144 at RESP0007443; Wawrzyniak Tr. 12.

[125] 6 *Del. C.* §§ 18-804(b)(2)–(3).

pending against it when it dissolved, in violation of Section 18-804(b).[126]  Such a

violation would be sufficient to nullify the Company's certificate of cancellation and

revive it for the purpose of facing Petitioner's claims, and others, in asbestos

litigation.[127]  Petitioner has demonstrated "a purpose for appointment of a receiver—

a problem or opportunity to be resolved or pursued."[128]  Accordingly, Petitioner has

shown good cause for the appointment of a receiver pursuant to Section 18-805.[129]

---

[126] *See TEO*, 2009 WL 4270799, at *4 (concluding the petitioner must "provide[] sufficient grounds for the Court to conclude that it is reasonably likely [the dissolved company] continues to hold undistributed assets"); *id.* ("[A] petitioner has not shown good cause under [Section 18-805's corporate analogue] if it does no more than speculate that the dissolved corporation may still have undistributed assets." (footnote omitted)); *see also Dow II*, 2008 WL 4989069, at *2 ("Speculating that respondent may have some assets is not sufficient to entitle petitioner to appointment of a receiver.").

[127] *Laudamiel,* 2012 WL 605589, at *22 n.148 ("[I]f the Court finds that an LLC's affairs were not wound up in compliance with the Delaware Limited Liability Company Act, it may nullify the certificate of cancellation, which effectively revives the LLC and allows claims to be brought by and against it." (citing *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004))).

[128] *TEO*, 2009 WL 4270799, at *5 n.39.

[129] *Cf. Techmer Accel Hldgs., LLC v. Amer*, 2010 WL 5564043, at *12 (Del. Ch. Dec. 29, 2010) ("Because Crescent filed a certificate of cancellation under § 17–203, the Court may appoint a receiver in accordance with § 17–805 upon a showing of good cause. With the conclusion that Crescent failed to settle and close the Limited Partnership's business because it retained assets and had outstanding liabilities when it cancelled its certificate of limited partnership on April 30, 2009, good cause exists for appointment of a receiver to undertake all activities permitted by § 17–805.").

**B.** **The Court Will Wait On The Receiver's Report To Determine Whether RWG's Certificate Of Cancellation Should Be Nullified.**

Nullifying a certificate of cancellation requires a statutory violation.[130] The standard to prove a statutory violation is by a preponderance of the evidence.[131] If, by that standard, RWG had assets that it did not use to "make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against [RWG] which is the subject of a pending action, suit, or proceeding to which [RWG] is a party," it violated Section 18-804(b)(2).[132] Pursuant to 6 *Del. C.* § 18-203, a certificate of cancellation should only be filed "upon the dissolution and the completion of winding up of a limited liability company . . . ."[133] If RWG had assets, it did not properly complete the requisite winding up process before filing its certificate of cancellation.

---

[130] *E.g.*, *Metro Commc'n*, 854 A.2d at 139 ("Thus, because the complaint pleads facts that support the inference that Fidelity Brazil was wound up in contravention of the LLC Act, the complaint also pleads facts that support an application to nullify the certificate of cancellation." (footnote omitted)); *accord In re Opus E., LLC*, 2015 WL 1404959, at *54 (Bankr. D. Del. 2015) ("Failure to comply with the statutory requirements for winding up an LLC results in revocation or nullification of the certificate of cancellation." (citing *Metro Commc'n*, 854 A.2d at 139–40)), *aff'd sub nom. In re: Opus E., LLC*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017).

[131] *See Martin*, 2015 WL 6472597, at *10 ("'Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence.'" (quoting *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015))).

[132] 6 *Del. C.* § 18-804(b)(2)

[133] *Id.* § 18-203.

34

To nullify RWG's certificate of cancellation, Petitioner would have to prove that statutory violation not just under a reasonable likelihood standard, but by a preponderance of the evidence. As the Court has stated in a similar context, "[a]lthough grounds may also exist for nullification of [the company's] certificate of cancellation, the appointment of a receiver under § 1[8]-805 provides the necessary relief under the circumstances."[134] I need not yet reach whether RWG violated Section 18-203.

This opinion stops at the appointment of a receiver. The receiver should investigate whether RWG had assets when it filed its notice of dissolution and cancellation. The receiver shall be empowered to investigate the existence of these assets, including both insurance policies and litigable claims. The receiver may also investigate how this litigation has been funded. The receiver should then submit a report in support of the receiver's determination, at which time I will revisit Count I. If the report and trial record supports a finding, by a preponderance of the evidence, that RWG violated Section 18-804, then its cancellation will be subject to nullification.

---

[134] *Techmer*, 2010 WL 5564043, at *12 (discussing 6 *Del. C.* § 17-805 (footnote omitted)).

35

## C. The Receiver's Identity And Compensation

Petitioner requested the Court to appoint Timothy Devlin as receiver.[135] Respondent argued that the Court should not appoint a receiver at all but if it did, it should not appoint Devlin, and instead appoint a receiver with experience in asbestos defense litigation.[136] The parties shall confer and submit a stipulated list of three possible receivers to the Court. The parties may include Petitioner's suggested receiver, Devlin, if they so choose. The parties must also be mindful of Chancery Rule 150, which prohibits a nonresident from serving as the "sole receiver" for a corporation, association, or partnership.[137] The parties should also submit a proposed appointment order. The Court will select a receiver from the parties' list and enter an order appointing the receiver.

"As a general rule, costs and expenses of a receivership, including compensation for the receiver, counsel fees, and obligations incurred by [her] in the discharge of [her] duties, constitute a first charge against the property or funds of the receivership."[138] "But an exception exists: 'Where there is no fund out of which expenses can be paid, or the fund is insufficient, the usual rule is that the party at

---

[135] Pet. ¶ 1.

[136] ROB at 28–32.

[137] Ct. Ch. R. 148; Ct. Ch. R. 150; *see Tratado*, 2019 WL 1057976, at *3.

[138] *Ferry v. Kehnast*, 2008 WL 2154861, at *4 (Del. Ch. May 6, 2008) (internal quotation marks and citations omitted).

whose instance the receiver was appointed should be required to provide the means of payment.'"[139]  Though, "'[i]n the absence of a statute, the receivership expenses may be adjudged against one or the other of the parties or apportioned between them in the discretion of the court.'"[140]  "Just as the determination of the amount of a receiver's compensation is a matter within the discretion of the trial court, so too is a determination of who should bear the expenses associated with the receivership . . . ."[141]  While there is a corporate statute governing the "[c]ompensation, costs and expenses of a receiver or trustee," there is not an analogous statute in the Limited Liability Company Act.[142]

The parties agree that the first source of payment should come from the the Company's assets, if any.[143]  They disagree as to who should pay for the receiver if

---

[139] *Longoria v. Somers as Tr. of Charles Somers Living Tr. Dated Nov. 2002*, 2019 WL 2270017, at *3 (Del. Ch. May 28, 2019) (quoting *Brill v. Southerland*, 14 A.2d 408, 413 (Del. 1940)) (collecting authorities); *cf.* 8 *Del. C.* § 298 ("The Court of Chancery, before making distribution of the assets of a corporation among the creditors or stockholders thereof, shall allow a reasonable compensation to the receiver or trustee for such receiver's or trustee's services, and the costs and expenses incurred in and about the execution of such receiver's or trustee's trust, and the costs of the proceedings in the Court, to be first paid out of the assets.").

[140] *Longoria*, 2019 WL 2270017, at *3 (quoting 75 C.J.S. *Receivers* § 364 (2019 update)).

[141] *Id.* (internal quotation marks omitted) (quoting 75 C.J.S. *Receivers* § 464 (2019 update)); *accord* 16 William Mead Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 7914 (2022 update).

[142] 8 *Del. C.* § 298.

[143] PAB at 33 ("[Petitioner] is a widower of a blue-collar worker who hired counsel on contingency.  In order for [Petitioner] to get justice here she needs a receiver who is willing

37

insufficient assets are found to cover the receiver's fee. Respondent, relying on decisions in *Jafar v. Vatican Challenge 2017, LLC*, argues if either no or insufficient assets are recovered, the Court should order Petitioner to compensate the receiver because the appointment of a receiver was for Petitioner's benefit.[144] In *Jafar*, the defendant defaulted in a books and records action under Section 18-305 and the Court appointed a receiver to enforce compliance with the Court's order mandating the production of certain books and records.[145] In its order granting the receiver's fees, the Court ordered "the first responsibility for compensating the Receiver [is to be] placed, appropriately, on the defaulting Defendant."[146]

While Petitioner ultimately seeks the appointment of a receiver to recover assets to potentially cover her damages claim, a receiver has been appointed because it is reasonably likely that RWG committed statutory violations during the course of its dissolution. Like *Jafar*, this action was an adversarial process in which RWG had an opportunity to avoid the cost of a receiver. RWG's conduct, not Petitioner's, has led to the additive cost of appointing a receiver. That said, if RWG has no assets,

---

to work on contingency."); ROB at 34 ("If this Court appoints a receiver and no assets are recovered, Petitioner should be ordered to compensate the receiver.").

[144] ROB at 34–35 (quoting *Jafar v. Vatican Challenge 2017, LLC* ("*Jafar I*"), 2022 WL 365142, at *3 (Del. Ch. Feb. 8, 2022), and citing *Jafar v. Vatican Challenge 2017, LLC* ("*Jafar II*"), 2022 WL 630371, at *1 (Del. Ch. Mar. 4, 2022)).

[145] *Jafar v. Vatican Challenge 2017, LLC*, C.A. No. 2020-0151-SG, D.I. 21 (Del. Ch. Feb. 11, 2021) (ORDER).

[146] *Jafar I*, 2022 WL 365142, at *3.

it simply cannot pay the receiver: it would be unjust to the receiver to order payment from RWG's empty coffers. Petitioner must bear the risk that her efforts are in vain. If the receiver finds insufficient assets from which she may be compensated, the receiver's unpaid fees and expenses shall be paid by Petitioner.[147]

### III. CONCLUSION

For the foregoing reasons, judgment is entered in Petitioner's favor on Count II. I defer judgment on Count I. The parties shall confer, resolve the issue of who is properly the respondent in this matter, and submit a list of three possible receivers and a proposed appointment order within forty days.

---

[147] If, like Devlin has, the appointed receiver agrees to a contingency arrangement, that arrangement must also address how the receiver will be paid if the discovered assets are ultimately not payable to Petitioner, either because she does not prevail in the Massachusetts Action or because the discovered assets would not cover her claim there.